UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:25-cr-00107-JA-LHP

IRIS YANETH VILLAFRANCA
    a/k/a Iris Yaneth Oseguera
    a/k/a Iris Rodriguez, *et al.*

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, IRIS YANETH VILLAFRANCA ("the defendant"), and the attorneys for the defendant, Rajan Joshi and Rick Jancha, mutually agree as follows:

**A.    Particularized Terms**

1.    Count(s) Pleading To

The defendant shall enter a plea of guilty to Counts One, Two, Four, Five, Six, and Seven of the Indictment. Count One charges the defendant with conspiracy to operate unlicensed money transmitting businesses, in violation of 18 U.S.C. § 371, and 18 U.S.C. §§ 1960(b)(1)(A), 1960(b)(1)(B), and 1960(b)(1)(C). Count Two charges the defendant with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Counts Four, Five, Six, and Seven charge the defendant with filing a false tax return, in violation of 18 U.S.C. § 7206(1).

Defendant's Initials _I V_                1

2. <u>Maximum Penalties</u>

Count One carries a maximum sentence of five years imprisonment, a fine of $250,000, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100 per felony count for individuals.

Count Two carries a maximum sentence of five years imprisonment, a fine of $250,000, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100 per felony count for individuals.

Counts Four, Five, Six, and Seven each carry a maximum sentence of three years imprisonment, a fine of $250,000, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than one year, and a special assessment of $100 per felony count for individuals.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3. <u>Elements of the Offense(s)</u>

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

Defendant's Initials _I V_                    2

The elements of Count One and Two are:

First: Two or more people in some way agreed to try to accomplish a shared and unlawful plan;

Second: The defendant knew the unlawful purpose of the plan and willfully joined in it;

Third: During the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the indictment; and

Fourth: The overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

The elements of Counts Four, Five, Six, and Seven are:

First: The defendant made or caused to be made a tax return;

Second: The tax return contained a written declaration that it was made under the penalty of perjury;

Third: When the defendant made or helped to make the tax return, she knew it contained false material information;

Fourth: When the defendant did so, she intended to do something she knew violated the law; and

Fifth: The false matter in the tax return related to a material statement.

4.   Counts Dismissed

The defendant accepts responsibility for the criminal conduct alleged in Count Three of the Indictment. At the time of sentencing, the remaining count against the defendant, Count Three, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.   No Further Charges

If the Court accepts this Plea Agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge the defendant with committing any other federal criminal offenses known to the United States Attorney's Office at

Defendant's Initials _I V_                3

the time of the execution of this Agreement, related to the conduct giving rise to this Plea Agreement.

6.      Restitution to Victim of Offense of Conviction

The defendant agrees to pay restitution to the Internal Revenue Service ("IRS") in the total amount of approximately $38,303,965.99, pursuant to 18 U.S.C. § 3663(a)(3).  The defendant agrees that the total amount of restitution reflected in this Agreement results from defendant's fraudulent conduct.

As presently calculated, the total amount of restitution, excluding interest and penalties, consists of the following:

| Shell Company | Calendar Years | Employment Taxes Due and Owing |
|---|---|---|
| DZ | 2014 | $481,748.43 |
| CAI | 2014–2015 | $2,737,322.62 |
| JZA | 2015–2017 | $8,635,783.85 |
| VAR | 2014, 2017 | $3,791,531.88 |
| MZA | 2016–2018 | $6,457,038.68 |
| ADD | 2017–2019 | $3,972,774.25 |
| FAR | 2018–2019 | $2,849,803.39 |
| EZM | 2019–2020 | $5,831,824.06 |
| ODZ | 2020–2021 | $2,584,602.97 |
| CAO | 2020–2022 | $961,535.86 |
| | Total: | $38,303,965.99 |

The defendant agrees that restitution is due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States.  If the Court imposes a schedule of payments, the defendant agrees that the

Defendant's Initials _I V_                    4

schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full. The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4). The defendant does not have the right to challenge the amount of this restitution-based assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor the defendant's timely payment of restitution according to that schedule will preclude the IRS from immediately collecting the full amount of the restitution-based assessment.

The defendant is entitled to receive credit for restitution paid pursuant to this Plea Agreement against those assessed civil tax liabilities due and owing for the same periods for which restitution was ordered. The defendant understands and agrees that the Plea Agreement does not resolve the defendant's civil tax liabilities, that the IRS may seek additional taxes, interest, and penalties from defendant relating to the conduct covered by this Plea Agreement and for conduct relating to another period, and that satisfaction of the restitution debt does not settle, satisfy, or compromise defendant's obligation to pay any remaining civil tax liability. The defendant authorizes release of information to the IRS for purposes of making the civil tax and restitution-based assessments.

The defendant understands that she is not entitled to credit with the IRS for any payment until the payment is received by the IRS.

Defendant's Initials _I_ _V_         5

If full payment cannot be made immediately, the defendant agrees to make a complete and accurate financial disclosure to the IRS on forms prescribed by the IRS (including, but not limited to, IRS Form 433-A and Form 433-B, as appropriate), and to disclose to the IRS all additional financial information and financial statements provided to the probation office. The defendant also agrees to provide the above-described information to the probation office.

If the defendant makes a payment of the restitution agreed to above prior to sentencing, the payment will be applied as a credit against the restitution ordered.

The defendant agrees to send all payments made pursuant to the court's restitution order to the Clerk of the Court at the following address:

> 401 West Central Boulevard
> Orlando, Florida 32801

With each payment to the Clerk of the Court made pursuant to the District Court's restitution order, the defendant will provide the following information:

> A. Defendant's name and Social Security number;
> B. The District Court and the docket number assigned to this case;
> C. Tax year(s) or period(s) for which restitution has been ordered; and D. A statement that the payment is being submitted pursuant to the District Court's restitution order.

The defendant agrees to include a request that the Clerk of the Court send the information, along with defendant's payments, to the IRS address below:

> IRS - RACS
> Attn: Mail Stop 6261, Restitution
> 333 W. Pershing Ave.
> Kansas City, MO 64108

Defendant's Initials _I V_          6

The defendant also agrees to send a notice of any payments made pursuant to this Agreement, including the information listed in the previous paragraph, to the IRS at the following address:

> IRS - RACS
> Attn: Mail Stop 6261, Restitution
> 333 W. Pershing Ave.
> Kansas City, MO 64108.

7.      Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the defendant and the United States have stipulated that the tax loss for sentencing purposes is more than $25 million, corresponding with U.S.S.G. § 2T4.1(L). The defendant stipulates that the total cash withdrawn and couriered for sentencing purposes, including all relevant conduct, is more than $89 million, corresponding with U.S.S.G. § 2B1.1(b)(1)(M). The defendant stipulates under U.S.S.G. § 2S1.3(b)(1)(A) that she knew or believed that the funds were proceeds of unlawful activity and were intended to promote unlawful activity.

The defendant understands that the United States may seek additional sentencing enhancement provided by the U.S. Sentencing Guidelines, including: (1) a two-level enhancement under U.S.S.G. § 2T1.1(b)(1) for failing to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity; (2) a two-level enhancement under U.S.S.G. § 2T1.1(b)(2) for the offense involving sophisticated means; (3) a two-level enhancement under U.S.S.G. § 2T1.9(b)(2) for encouraging others to impede, impair, obstruct, or defeat the

Defendant's Initials _I V_               7

ascertainment, computation, assessment, or collection of revenue; (4) a four-level aggravating role enhancement under U.S.S.G. § 3B1.1(a); and (5) a two-level obstruction enhancement under U.S.S.G. § 3C1.1. The defendant has reserved her right to challenge the application of these enhancements at sentencing.

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this Plea Agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the Plea Agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.    Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with

Defendant's Initials _L V_          8

the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including, but not limited to, the timely submission of the financial affidavit referenced above, the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that she cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.     Cooperation - Substantial Assistance to be Considered

The defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the

Defendant's Initials _I V_                9

applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed after sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and defendant agrees that she cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10.     Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during defendant's cooperation and pursuant to this Agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

11.     Cooperation - Responsibilities of Parties

a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by

Defendant's Initials _I V_            10

assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b. It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1) The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2) The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury,

Defendant's Initials _I V_         11

and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

12.     Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or

Defendant's Initials $\underline{I\ V}$                    12

control of the United States, the defendant, or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $89 million in proceeds the defendant admits she obtained, as the result of the commission of the offenses to which defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of the offense(s), and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds defendant obtained, as the result of the offense(s) of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense(s) and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance

Defendant's Initials _I V_          13

of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the

Defendant's Initials _I V_          14

previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by defendant as part of her cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this Plea Agreement are intended to, and will, survive defendant, notwithstanding the abatement of any

Defendant's Initials _I V_          15

underlying criminal conviction after the execution of this Agreement. The forfeitability of any particular property pursuant to this Agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors, and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

The Defendant admits that she is the true owner of the real properties listed below not titled in her name, that she paid for these properties, and that the titled owners provided no legal consideration for any interest they may have in the properties:

(i)     5214 Mahogany Drive, Mt. Dora, Florida titled in the name of Reyo Investments Corp.;
(ii)    616 Hummingbird Lane, Orlando, Florida titled in the name of Iris Villafranca;
(iii)   618 Hummingbird Lane, Orlando, Florida titled in the name of Iris Villafranca; and
(iv)    3007 Johnny Street, Orlando, Florida titled in the name of the Villafranca Revocable Living Trust.

The defendant also agrees to cooperate with the United States by providing an exhaustive list of all foreign and domestic assets in which she has a financial interest and executing all requisite paperwork to facilitate the transfer of any assets in satisfaction of the Court's Forfeiture and Restitution Orders.

**B.     Standard Terms and Conditions**

1.      Supervised Release

The defendant understands that the offenses to which defendant is pleading provide for imposition of a term of supervised release upon release from

Defendant's Initials _I V_          16

imprisonment, and that, if defendant should violate the conditions of release, defendant would be subject to a further term of imprisonment.

2.     Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a natural-born United States citizen may face numerous immigration consequences, including: be removed from the United States, denied citizenship, and denied admission to the United States in the future.

3.     Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

4.     Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this Agreement an affidavit reflecting defendant's financial condition. The defendant promises that her financial statement and

Defendant's Initials _I V_                    17

disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of defendant's federal, state, and local tax returns, bank records and any other financial information concerning defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

5.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this Agreement. The Court may accept or reject the agreement or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments

Defendant's Initials _I V_            18

to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. The defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this Plea Agreement. The government expressly reserves the right to support and defend any decision that the Court may make regarding the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

6.      Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then

Defendant's Initials _I V_              19

the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

7. Middle District of Florida and Tax Division Agreement

It is further understood that this Agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the Tax Division and cannot bind other federal, state, or local prosecuting authorities, although this office will bring the defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

8. Filing of Agreement

This Agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

9. Voluntariness

The defendant acknowledges that defendant is entering into this Agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if

Defendant's Initials __L√__                20

any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

10.  Factual Basis

The defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and, were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials _I V_          21

11. <u>Entire Agreement</u>

This Plea Agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to defendant or defendant's attorney with regard to such guilty plea.

12. <u>Certification</u>

The defendant and defendant's counsel certify that this Plea Agreement has been read in its entirety by (or has been read to) defendant and that defendant fully understands its terms.

DATED this __19__ day of August 2025.

GREGORY W. KEHOE
United States Attorney

IRIS YANETH VILLAFRANCA
Defendant

/s/Kavitha Bondada

SEAN BEATY
Senior Litigation Counsel
Virginia Bar No. 67941
Kavitha Bondada
Trial Attorney
Texas Bar No. 24085815
Rebecca A. Caruso
Trial Attorney
Virginia Bar No. 90613
150 M Street NE
Washington, D.C. 20002
Phone: (202) 616-2717
sean.p.beaty@usdoj.gov
kavitha.bondada@usdoj.gov
rebecca.caruso@usdoj.gov
U.S. Department of Justice, Tax Division

Defendant's Initials __IV__          22

Rajan Joshi
Rick Jancha
Attorneys for Defendant

Defendant's Initials _I K_     23

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:25-cr-00107-JA-LHP

IRIS YANETH VILLAFRANCA
a/k/a Iris Yaneth Oseguera
a/k/a Iris Rodriguez, *et al.*

## PERSONALIZATION OF ELEMENTS

The defendant acknowledges understanding the nature and elements of the

offense(s) with which defendant has been charged and to which defendant is

pleading guilty.

The elements of Counts One and Two are:

| | |
|---|---|
| First: | Two or more people in some way agreed to try to accomplish a shared and unlawful plan; |
| Second: | The defendant knew the unlawful purpose of the plan and willfully joined in it; |
| Third: | During the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the indictment; and |
| Fourth: | The overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy. |

The elements of Counts Four, Five, Six, and Seven are:

| | |
|---|---|
| First: | The defendant made or caused to be made a tax return; |
| Second: | The tax return contained a written declaration that it was made under the penalty of perjury; |
| Third: | When the defendant made or helped to make the tax return, she knew it contained false material information; |

Defendant's Initials _IV_                    24

Fourth:     When the defendant did so, she intended to do something she knew violated the law; and

Fifth:     The false matter in the tax return related to a material statement.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:25-cr-00107-JA-LHP

IRIS YANETH VILLAFRANCA
    a/k/a Iris Yaneth Oseguera
a/k/a Iris Rodriguez, *et al.*

## FACTUAL BASIS

The factual basis set forth below is merely a summary of some of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all the events, persons involved, or other information relating to this case.

Beginning in or around October 2015 and continuing through at least August 2022, within the Middle District of Florida and elsewhere, the defendant, Iris Villafranca ("VILLAFRANCA") engaged in a scheme to create an off-the-books payroll. This scheme included, among other things, (1) cashing checks and transporting cash for subcontractors working in the construction industry without the required licenses for money transmitters, (2) defrauding workers' compensation insurance companies, and (3) defrauding the Internal Revenue Service. VILLAFRANCA conspired with Michael Mayorga ("Mayorga"), M.Z.A., Mario Lisandro Flores Moradel ("Flores"), Francisco Alvarez ("F. Alvarez"), E.Z.M.,

Defendant's Initials _IV_                    26

Osman Donaldo Zapata ("O. ZAPATA"), Cristofer Alfredo Oseguera Giron

("OSEGUERA"), and others known and unknown ("the conspirators").

## The Shell Companies

1. VILLAFRANCA and her conspirators caused the registration of several

different shell companies. The shell companies included, but are not limited to, DZ,

CAI, JZA, VAR, MZA, ADD, FAR, EZM, ODZ, and CAO.

2. MZA, ADD, FAR, EZM, ODZ, and CAO ("the shell companies"),

operated in furtherance of the scheme, in or about the years set forth below:

| Approximate Years | Shell Company Name | Purported Owner |
| --- | --- | --- |
| 2016–2018 | MZA | M.Z.A. |
| 2017–2018 | ADD | FLORES |
| 2018–2019 | FAR | F.A. |
| 2019–2020 | EZM | E.A.Z.M. |
| 2020–2021 | ODZ | O. ZAPATA |
| 2020–2022 | CAO | OSEGUERA |

## Unlicensed Check Cashing and Cash Courier Services

3. A "money transmitting business" was a business that, among other

things, cashed checks and transported cash. To legally operate as a money

transmitting business, the business was required to register with the appropriate state

and federal authorities.

4. The laws of the State of Florida required that a person or a business

have a license to conduct a money transmitting business. Florida law punished as a

felony the unlicensed operation of a money transmitting business involving currency,

Defendant's Initials _I V_ 27

or payment instruments of a value totaling or exceeding $300 in any twelve-month period.

5. Title 31, United States Code, Section 5330(a), and regulations promulgated pursuant to that statute, required individuals who owned or controlled a money transmitting business to register the business with the Secretary of the Treasury no later than 180 days after the date on which the business was established.

6. The conspirators did not have a license from the State of Florida to operate a money transmitting business, nor did they register any money transmitting businesses with the Secretary of the Treasury.

7. Bank 1, Bank 2, Bank 3, Bank 4, and Bank 5 each had branch locations in the Middle District of Florida and elsewhere that operated in interstate commerce. The conspirators used these banks to operate their unlicensed money transmitting business.

**Taxes and the Internal Revenue Service**

8. The Internal Revenue Service ("IRS") was an agency of the U.S. Department of Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

9. In addition, employers were required to file an IRS Form 941, Employer's Quarterly Federal Tax Return ("Form 941"), which was used to report all wages paid to employees and all federal employment taxes withheld from those wages. Most employers were required to file Forms 941 four times per year—one

Defendant's Initials _I V_          28

Form 941 for each quarter ending March 31; June 30; September 30; and December 31.

10. IRS Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return ("Form 940"), was used by employers to report their annual Federal Unemployment Tax.

11. IRS Form 1120-S, U.S. Income Tax Returns for an S Corporation ("Form 1120-S"), was used by companies to report the income, gains, losses, deductions, credits, etc. of a domestic corporation or other entity for any tax year covered by an election to be treated an "S corporation" for tax purposes.

12. IRS Form 1099-MISC, Miscellaneous Income ("Form 1099"), was used to report, among other things, certain payments made to individuals in connection with a trade or business.

13. IRS Form 1096, Annual Summary and Transmittal of U.S. Information Returns ("Form 1096"), was used to transmit certain paper forms, including Forms 1099, to the IRS. Form 1096 was signed under penalties of perjury.

14. IRS Form 1040, U.S. Individual Income Tax Return, ("Form 1040"), was used by U.S. taxpayers to file an annual income tax return.

15. The Electronic Federal Tax Payment System ("EFTPS") was a U.S. Department of Treasury system used to pay federal taxes.

Defendant's Initials _L V_   29

## Workers' Compensation Insurance

16. Company 1 was an insurance agency that operated in Florida ("Company 1"). Company 1 secured workers' compensation insurance policies from nationwide insurance companies.

17. Company 2 was an insurance agency that operated in Florida ("Company 2"). Company 2 secured workers' compensation insurance policies from nationwide insurance companies.

18. Company 3 was an insurance agency that operated in Florida ("Company 3"). Company 3 secured workers' compensation insurance policies from nationwide insurance companies.

19. A business that provided construction services in the State of Florida was required by Florida law to possess workers' compensation insurance for its workers. Florida law also required all contractors to provide evidence that all subcontractors possessed workers' compensation insurance before any work began on a construction project.

20. A construction company typically could not work in the State of Florida without first providing proof of workers' compensation insurance in the form of a Certificate of Liability Insurance ("COI"). The COI would declare that the subcontractor had the requisite insurance coverage, but did not usually include the number of workers or the amount of payroll covered by the insurance policy.

21. Section 274A of the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986, required employers

Defendant's Initials _I V_          30

to hire only United States citizens and aliens authorized to work in the United States. In general, it is unlawful for a person or other entity to hire, recruit or refer for a fee, for employment in the United States, an alien knowing this individual is an unlawful alien. Further, Section 274A of the INA stipulates it is unlawful for a person or entity, after hiring an alien for employment, to continue to employ the alien in the United States knowing the alien is (or has become) an unlawful alien with respect to such employment.

### Operation of Unlicensed Money Transmitting Businesses
### Overview of the Conspiracy

22. The conspirators ran an unlicensed check cashing and cash courier service business that unlawfully cashed and transported approximately $89 million for the construction subcontractors. The conspirators, led by VILLAFRANCA, charged fees for their check cashing and cash courier services that was a percent of the amount of the checks being cashed.

23. VILLAFRANCA and M.Z.A., and others known and unknown, directed the construction subcontractors to cause contractors to draft checks in the names of the shell companies. VILLAFRANCA and M.Z.A. also caused the construction subcontractors to wire money to shell company bank accounts. These funds were usually payments issued by a contractor for work performed by the subcontractors. The conspirators then generally had the checks cashed and delivered the cash to the subcontractors, less the conspirators' fee.

Defendant's Initials _L V_       31

24. The conspirators operated their money transmitting businesses without obtaining the required licenses from the State of Florida, without registering federally with the Secretary of the Treasury, and intending that the funds that were transported and transmitted be used to promote and support unlawful activity.

25. As a part of the check cashing and cash courier service business, VILLAFRANCA, and others provided the construction subcontractors or caused the construction subcontractors to be provided with certificates of insurance, or proof of workers' compensation insurance. VILLAFRANCA, and others, helped construction subcontractors to obtain work that they otherwise would have been unable to obtain.

### Manner and Means of the Conspiracy

26. The manner and means by which VILLAFRANCA, M.Z.A., FLORES, F.A., E.A.Z.M., O. ZAPATA, OSEGUERA, and their conspirators carried out their conspiracy included the following:

27. VILLAFRANCA and M.Z.A. caused FLORES, F.A., E.A.Z.M., O. ZAPATA, and OSEGUERA to open bank accounts in the names of the shell companies at Bank 1, Bank 2, Bank 3, Bank 4, and Bank 5. M.Z.A., FLORES, F.A., E.A.Z.M., O. ZAPATA, and OSEGUERA, and others, were authorized to deposit checks and withdraw cash from the shell company bank accounts.

28. FLORES, F.A., E.A.Z.M., O. ZAPATA, and OSEGUERA, and others, sometimes went to physical branch locations owned by Bank 1, Bank 2, Bank

Defendant's Initials _I V_          32

3 and Bank 4, and deposited and caused checks to be deposited in person into bank accounts held in the names of the shell companies.

29. After the checks had posted, FLORES, F.A., E.A.Z.M., O. ZAPATA, and OSEGUERA, and others, drove back to the bank to withdraw cash and caused cash to be withdrawn from the shell company bank accounts.

30. FLORES, F.A., E.A.Z.M., O. ZAPATA, OSEGUERA and others, caused the cash to be transported from the bank to VILLAFRANCA and M.Z.A. VILLAFRANCA and M.Z.A. and others known and unknown, typically counted the cash, divided it into envelopes, and provided the envelopes to FLORES, F.A., E.A.Z.M., O. ZAPATA, and OSEGUERA.

31. After VILLAFRANCA, M.Z.A., and others, counted the cash and organized it, FLORES, F.A., E.A.Z.M., O. ZAPATA, OSEGUERA, and others known and unknown, picked up the cash from VILLAFRANCA and/or M.Z.A., and others, and delivered it to the subcontractors.

32. FLORES, F.A., E.A.Z.M., O. ZAPATA, OSEGUERA, and others, met the subcontractors in different parking lots across the Middle District of Florida and gave them the cash; the subcontractors then used the money to pay their workers. VILLAFRANCA, M.Z.A., FLORES, F.A., E.A.Z.M., O. ZAPATA, OSEGUERA, and their conspirators knew that the subcontractors were using the cash they received to pay the wages of undocumented workers.

33. VILLAFRANCA, M.Z.A., FLORES, F.A., E.A.Z.M., O. ZAPATA, OSEGUERA, and their conspirators sometimes transferred and caused the transfer

Defendant's Initials _I.V._     33

of money from shell company to shell company to make sure there were sufficient funds in the shell company bank accounts to withdraw cash.

34. VILLAFRANCA and M.Z.A., and others, would manage the flow of checks and cash from the subcontractors to the shell companies' bank accounts, and back to the subcontractors.

35. VILLAFRANCA, and others, would cause certificates of insurance to be provided to contractors on behalf of the subcontractors. By funneling payroll through the shell companies, the contractors and the subcontractors could disclaim responsibility for ensuring (1) that adequate workers' compensation insurance was provided, and (2) that the workers were legally authorized to work in the United States.

**Overt Acts Related to MZA**

36. M.Z.A. opened bank accounts at Bank 1, Bank 2, Bank 3, Bank 4, and elsewhere, in the name of MZA. M.Z.A., VILLAFRANCA, and their conspirators deposited and caused the deposit of funds and withdrew and caused the withdrawal of cash in the following amounts, among other deposits and withdrawals:

| Approximate Date | Bank | Account Number | Amount | Withdrawal or Deposit |
|---|---|---|---|---|
| August 5, 2016 | Bank 1 | x2678 | $102,165 | Deposit |
| August 26, 2016 | Bank 1 | x2678 | $120,000 | Cash Withdrawal |
| September 8, 2016 | Bank 2 | x7882 | $15,600 | Wire Deposit |
| September 23, 2016 | Bank 1 | x2678 | $170,000 | Cash Withdrawal |
| November 18, 2016 | Bank 4 | x1125 | $73,020 | Deposit |
| November 18, 2016 | Bank 4 | x1125 | $80,000 | Cash Withdrawal |
| November 23, 2016 | Bank 4 | x1125 | $15,292 | Deposit |
| November 23, 2016 | Bank 4 | x1125 | $23,151 | Deposit |

Defendant's Initials _L V_            34

| Approximate Date | Bank | Account Number | Amount | Withdrawal or Deposit |
|---|---|---|---|---|
| November 28, 2016 | Bank 2 | x7882 | $63,000 | Wire Deposit |
| November 29, 2016 | Bank 1 | x2678 | $354,014 | Cashier's Check Withdrawal |
| December 6, 2016 | Bank 4 | x1125 | $354,014 | Cashier's Check Deposit |

37. From 2016 through 2019, M.Z.A., VILLAFRANCA, and their conspirators cashed and caused to be cashed approximately $25,594,671 through MZA bank accounts and other check cashing businesses. VILLAFRANCA, M.Z.A., and their conspirators caused the delivery of cash back to the subcontractors.

**Overt Acts Related to ADD**

38. FLORES opened bank accounts at Bank 1, Bank 2, Bank 3, and Bank 4 in the name of ADD.

39. FLORES, VILLAFRANCA, and their conspirators deposited and caused the deposit of funds and withdrew and caused the withdrawal of cash in the following amounts, among other deposits and withdrawals:

| Approximate Date | Bank | Account Number | Amount | Withdrawal or Deposit |
|---|---|---|---|---|
| January 2, 2018 | Bank 1 | x0796 | $50,000 | Cash Withdrawal |
| January 11, 2018 | Bank 1 | x0796 | $77,872 | Deposit |
| January 11, 2018 | Bank 1 | x0796 | $14,713 | Deposit |
| January 18, 2018 | Bank 1 | x0796 | $40,000 | Cash Withdrawal |
| May 3, 2018 | Bank 1 | x0796 | $77,286 | Deposits |
| May 4, 2018 | Bank 1 | x0796 | $50,000 | Cash Withdrawal |
| May 11, 2018 | Bank 1 | x0796 | $42,941 | Deposit |
| May 11, 2018 | Bank 1 | x0796 | $50,000 | Cash Withdrawal |

Defendant's Initials _L V_    35

| Approximate Date | Bank | Account Number | Amount | Withdrawal or Deposit |
|---|---|---|---|---|
| May 21, 2018 | Bank 1 | x0796 | $136,198 | Withdrawal |

40. From 2017 through 2018, FLORES, VILLAFRANCA, and their conspirators cashed and caused to be cashed approximately $15,702,665 through ADD bank accounts and other check cashing businesses. VILLAFRANCA, M.Z.A., and their conspirators caused the delivery of cash back to the subcontractors.

**Overt Acts Related to FAR**

41. F. Alvarez opened bank accounts at Bank 1, Bank 2, Bank 3, and Bank 4 in the name of FAR.

42. F. Alvarez, VILLAFRANCA, and their conspirators deposited and caused the deposit of funds and withdrew and caused the withdrawal of cash in the following amounts, among other deposits and withdrawals:

| Approximate Date | Bank | Account Number | Amount | Withdrawal or Deposit |
|---|---|---|---|---|
| April 5, 2019 | Bank 4 | x0971 | $33,880 | Deposit |
| April 10, 2019 | Bank 4 | x0971 | $20,000 | Cash Withdrawal |

43. From 2018 through 2019, F. Alvarez, VILLAFRANCA, and their conspirators cashed and caused to be cashed approximately $11,304,045 through FAR bank accounts. VILLAFRANCA and M.Z.A. caused the cash to be counted into envelopes and provided back to the subcontractors.

Defendant's Initials _IV_          36

## Overt Acts Related to EZM

44.     E.A.Z.M. opened bank accounts at Bank 1, Bank 2, Bank 3, and Bank 4 in the name of EZM.

45.     E.A.Z.M., VILLAFRANCA, and their conspirators deposited and caused the deposit of funds and withdrew and caused the withdrawal of cash in the following amounts, among other deposits and withdrawals:

| Approximate Date | Bank | Account Number | Amount | Cash Withdrawal or Deposit |
|---|---|---|---|---|
| February 7, 2019 | Bank 3 | x1204 | $51,416 | Deposit |
| February 11, 2019 | Bank 3 | x1204 | $30,000 | Cash Withdrawal |
| February 15, 2019 | Bank 3 | x1204 | $70,054 | Deposit |
| February 20, 2019 | Bank 3 | x1204 | $50,000 | Cash Withdrawal |
| March 8, 2019 | Bank 3 | x1204 | $47,047 | Cash Deposit |
| March 11, 2019 | Bank 3 | x1204 | $40,000 | Cash Withdrawal |
| March 14, 2019 | Bank 3 | x1204 | $42,578 | Deposit |
| March 18, 2019 | Bank 3 | x1204 | $80,000 | Deposit |

46.     From 2019 through 2020, E.A.Z.M., VILLAFRANCA, and their conspirators cashed and caused to be cashed approximately $23,050,688 through EZM bank accounts.  VILLAFRANCA, M.Z.A., and their conspirators caused the delivery of cash back to the subcontractors.

## Overt Acts Related to ODZ

47.     O. ZAPATA opened bank accounts at Bank 2, Bank 3, and Bank 5 in the name of ODZ.

48.     O. ZAPATA, VILLAFRANCA, and their conspirators deposited and caused the deposit of funds and withdrew and caused the withdrawal of cash in the following amounts, among other deposits and withdrawals:

Defendant's Initials _I. V._          37

| Approximate Date | Bank | Account Number | Amount | Cash Withdrawal or Deposit |
|---|---|---|---|---|
| September 3, 2020 | Bank 3 | x0628 | $160,244 | Deposit |
| September 4, 2020 | Bank 3 | x0628 | $80,000 | Cash Withdrawal |
| September 8, 2020 | Bank 3 | x0628 | $60,600 | Cash Withdrawal |

From 2020 through 2021, O. ZAPATA, VILLAFRANCA, and their conspirators cashed and caused to be cashed approximately $10,244,822 through ODZ bank accounts. VILLAFRANCA, M.Z.A., and their conspirators caused the delivery of cash back to the subcontractors.

### Overt Acts Related to CAO

49. OSEGUERA opened bank accounts at Bank 1, Bank 2, and Bank 3 in the name of CAO.

50. OSEGUERA, VILLAFRANCA, and their conspirators deposited and caused the deposit of funds and withdrew and caused the withdrawal of cash in the following amounts, among other deposits and withdrawals:

| Approximate Date | Bank | Account Number | Amount | Cash Withdrawal or Deposit |
|---|---|---|---|---|
| December 4, 2020 | Bank 3 | x1405 | $50,000 | Deposit |
| December 7, 2020 | Bank 3 | x1405 | $81,500 | Deposit |
| December 10, 2020 | Bank 3 | x1405 | $10,000 | Cash Withdrawal |
| December 11, 2020 | Bank 3 | x1405 | $50,000 | Cash Withdrawal |
| December 12, 2020 | Bank 3 | x1405 | $15,000 | Cash Withdrawal |
| February 19, 2021 | Bank 3 | x1405 | $40,000 | Cash Withdrawal |
| March 12, 2021 | Bank 3 | x1405 | $20,000 | Cash Withdrawal |
| September 3, 2021 | Bank 3 | x1405 | $30,000 | Cash Withdrawal |
| November 13, 2021 | Bank 3 | x1405 | $25,000 | Cash Withdrawal |
| November 19, 2021 | Bank 3 | x1405 | $40,000 | Cash Withdrawal |

Defendant's Initials _I V_                38

51. From 2020 through 2022, OSEGUERA, VILLAFRANCA, and their conspirators cashed and caused to be cashed approximately $3,800,537 through CAO bank accounts and other check cashing businesses. VILLAFRANCA, M.Z.A., and their conspirators caused the delivery of cash back to the subcontractors.

## Conspiracy to Defraud the United States
### Overview of the Conspiracy

52. The conspirators, and others, concealed their scheme and defrauded the IRS by creating an off-the-books cash payroll.

### Manner and Means of the Conspiracy

53. The manner and means by which VILLAFRANCA, M.Z.A., FLORES, F. Alvarez, E.A.Z.M., O. ZAPATA, OSEGUERA, Mayorga, and their conspirators carried out their conspiracy included the following:

54. M.Z.A., FLORES, F. A, E.A.Z.M., O. ZAPATA, and OSEGUERA agreed to act as owners of the shell companies and cause the filing of false tax documents with the IRS to conceal the off-the-books payroll scheme, as set forth below:

    a. VILLAFRANCA and M.Z.A. caused FLORES, F.A., E.A.Z.M., O. ZAPATA, and OSEGUERA to have Mayorga prepare the shell companies' tax returns and tax-related documents.

Defendant's Initials _I V_       39

b. Mayorga provided bookkeeping services to the shell companies and used the records he created to prepare and cause the filing of false tax documents with the IRS.

c. The conspirators made minimal employment tax deposits to create the appearance that the shell companies were operating legitimately and conceal their fraud scheme from the IRS.

d. The conspirators filed and caused the filing of false individual income tax returns with the IRS to create the appearance that the shell companies were operating legitimately and conceal their fraud scheme from the IRS.

55. The conspirators met to discuss grand jury subpoenas issued in conjunction with an ongoing criminal investigation and then created false documents and provided those false documents to the grand jury in response to the subpoenas.

**Overt Acts in Furtherance of the Conspiracy**

56. The conspirators set up EFTPS accounts for each of the shell companies. Using this system, the conspirators made minimal employment tax payments to the IRS on behalf of the shell companies.

57. On or about February 12, 2019, VILLAFRANCA, Mayorga, and F. Alvarez filed and caused the filing of a false 2018 Form 1096 on behalf of FAR. This form reported the issuance of twenty-one Forms 1099-MISC by FAR to construction businesses totaling $12,405,321. This Form 1096 was false, as were the Forms 1099-

Defendant's Initials _I V_        40

MISC attached to the Form 1096.  FAR never paid the construction businesses it claimed to have paid on the Forms 1099-MISC.

58.     On or about February 27, 2019, VILLAFRANCA, Mayorga, and FLORES filed and caused the filing of a false 2018 Form 1096 on behalf of ADD. This form falsely reported the issuance of twelve Forms 1099-MISC by ADD to subcontractors totaling $12,334,216. This Form 1096 was false, as were the Forms 1099-MISC attached to the Form 1096.  ADD never paid the construction businesses it claimed to have paid on the Forms 1099-MISC.

59.     On or about the approximate dates listed below, the conspirators filed and caused the filing the following false and misleading returns for the year and quarters as follows, each filing constituting a separate overt act:

| Overt Act | Approximate Date Filed | Shell Company | Return | Year/Quarter Ending |
|---|---|---|---|---|
| (a) | 10/31/2016 | MZA | Form 941 | 09/30/2016 |
| (b) | 4/15/2017 | MZA | Form 1120-S | 2016 |
| (c) | 4/30/2017 | MZA | Form 941 | 03/31/2017 |
| (d) | 1/31/2018 | MZA | Form 940 | 2017 |
| (e) | 4/03/2018 | MZA | Form 1120-S | 2017 |
| (f) | 4/03/2018 | ADD | Form 1120-S | 2017 |
| (g) | 8/20/2018 | ADD | Form 941 | 06/30/2018 |
| (h) | 10/31/2018 | FAR | Form 941 | 09/30/2018 |
| (i) | 1/31/2019 | FAR | Form 941 | 12/31/2018 |
| (j) | 1/31/2019 | FAR | Form 940 | 2018 |
| (k) | 1/31/2019 | ADD | Form 940 | 2018 |
| (l) | 3/18/2019 | FAR | Form 1120-S | 2018 |
| (m) | 4/16/2019 | MZA | Form 1120-S | 2018 |
| (n) | 4/22/2019 | ADD | Form 1120-S | 2018 |

Defendant's Initials _I V_              41

| Overt Act | Approximate Date Filed | Shell Company | Return | Year/Quarter Ending |
|---|---|---|---|---|
| (o) | 9/10/2019 | EZM | Form 941 | 6/30/19 |
| (p) | 10/31/2019 | EZM | Form 941 | 9/30/19 |
| (q) | 1/31/2020 | EZM | Form 940 | 12/31/2019 |
| (r) | 1/31/2020 | EZM | Form 941 | 12/31/2019 |
| (s) | 4/30/2020 | EZM | Form 941 | 03/31/2020 |
| (t) | 5/27/2020 | EZM | Form 1120-S | 2019 |
| (u) | 7/31/2020 | EZM | Form 941 | 06/30/2020 |
| (v) | 10/31/2020 | ODZ | Form 941 | 09/30/2020 |
| (w) | 3/02/2021 | ODZ | Form 940 | 2020 |
| (x) | 3/01/2021 | ODZ | Form 941 | 12/31/2020 |
| (y) | 3/30/2021 | ODZ | Form 1120-S | 2020 |
| (z) | 10/13/2021 | CAO | Form 1120-S | 2020 |

60. After the service of grand jury subpoenas on ADD, FAR, EZM, and Mayorga, the conspirators met at the home of VILLAFRANCA to coordinate how to further conceal the conspiracy and decide what to create and produce in response to the grand jury subpoenas.

61. In response to the grand jury subpoenas, the conspirators created and caused the creation of false documents and produced those false documents to the grand jury. These false documents purported to support the false 2018 Forms 1096 and associated Forms 1099 filed by ADD and FAR.

62. After the service of a grand jury subpoena on ADD, FLORES made false statements to a Special Agent of the IRS to further conceal the conspiracy.

Defendant's Initials _I V_       42

## Wire Fraud Conspiracy
## Overview of the Conspiracy

63. VILLAFRANCA, Mayorga, MZA, and others promoted and carried out a scheme to defraud workers' compensation insurance companies with, among other things, policy premiums. VILLAFRANCA and her conspirators rented workers' compensation coverage — through policies fraudulently obtained in the name of the shell companies with false representations regarding the scope of coverage — to subcontractors in the construction industry. The subcontractors used the policies to represent that they maintained the appropriate insurance coverage required for a particular construction project. VILLAFRANCA and her conspirators charged the subcontractors a fee to rent the workers' compensation insurance.

64. By renting workers' compensation coverage from the conspirators, the subcontractors were (1) able to get jobs that they were otherwise unable to get from contractors, (2) pay less for workers' compensation insurance, and (3) disclaim responsibility for ensuring adequate workers' compensation insurance had been obtained.

65. As part of the workers' compensation insurance rental scheme, the subcontractors and their laborers would usually work under whatever shell company name that VILLAFRANCA and her conspirators told them to use. VILLAFRANCA and her conspirators typically provided the paperwork associated with MZA, ADD, FAR, EZM, ODZ, and CAO for one year, which was generally how long a policy could be in force before an audit took place.

Defendant's Initials _I_V_    43

## Manner and Means of the Conspiracy

66.     The manner and means by which VILLAFRANCA and her conspirators carried out their conspiracy included the following:

67.     VILLAFRANCA, and others, caused the shell companies to open email accounts in their names, including, but not limited to ADDRemodeling[at]aol.com, FARRemodelingServiceInc [at]outlook.com, EZARemodelingService[at]gmail.com, odzrenovationinc[at]yahoo.com and CAOREMODELINGINC[at]gmail.com.  VILLAFRANCA caused these email addresses to be used to communicate with the workers' compensation insurance companies.

68.     VILLAFRANCA, and others, on behalf of the shell companies, submitted and caused to be submitted, workers' compensation insurance applications.  The applications falsely represented that the workers' compensation insurance would cover the estimated annual payroll amount.

69.     VILLAFRANCA, and others, caused Company 1, Company 2, and Company 3 to issue workers' compensation insurance policies to the shell companies.  The annual workers' compensation insurance premium was based on the information provided in the applications, including the estimated payroll to be covered by the policy.  VILLAFRANCA and her conspirators secured lower annual premiums by misreporting the amount of payroll that was reasonably foreseeable during the coverage period.

Defendant's Initials _I V_                44

70. VILLAFRANCA and her conspirators generally paid the nominal estimated annual premiums using the associated shell company bank accounts. If Company 1, Company 2, and Company 3 had known the amount of payroll that was actually paid under the policy, they would have charged a higher annual workers' compensation insurance premium.

71. Company 1, Company 2, and Company 3 issued policies underwritten by nationwide insurance companies that generally prohibited the transfer of rights under the policies. Despite this provision, the conspirators "rented" the certificates of insurance ("COI — proofs of insurance — to the construction subcontractors in exchange for a fee. The purpose of renting the COIs to the subcontractors was to help the subcontractors falsely represent to contractors that they had sufficient workers' compensation insurance, as required by Florida law.

72. The conspirators requested, and caused to be requested, COIs from the workers' compensation insurance companies. The workers' compensation insurance companies provided COIs by electronic transmission in interstate commerce. The conspirators provided and caused the COIs to be provided to contractors, as proof of the subcontractors' workers' compensation insurance coverage. The COIs falsely represented to contractors that the subcontractors had sufficient workers' compensation insurance, as required by Florida law.

73. If a shell company was audited by a workers' compensation insurance company, Mayorga, at VILLAFRANCA and others' behest, responded to questions

from the auditors, and typically provided false and misleading information to the auditors.

74. ADD was audited by a workers' compensation insurance auditor in or about September 2019. VILLAFRANCA, FLORES, Mayorga, and their conspirators, acting in furtherance of the conspiracy, caused the auditor to be provided with a false profit and loss statement that stated that ADD's gross sales were $526,961. During this same period, ADD withdrew over $15 million in cash from its bank accounts.

75. EZM was audited by a workers' compensation insurance auditor in or about July 2019 and June 2020. VILLAFRANCA, E.A.Z.M., M.M., and their conspirators, acting in furtherance of the conspiracy, caused the auditor to be provided with false and misleading information.

76. On or about June 28, 2021, VILLAFRANCA, OSEGUERA, and their conspirators caused CAO to receive a wire from a construction company in the amount of $4,268, into x9546, a bank account CAO held with Bank 2.

77. On or about August 23, 2022, VILLAFRANCA, OSEGUERA, and their conspirators caused CAO to pay approximately $1,044 towards the workers' compensation insurance it had fraudulently obtained.

78. Neither the shell companies nor the subcontractors provided adequate workers' compensation insurance for the workers, in violation of Florida law.

## Filing False Tax Returns

79. On or about the dates specified below, in the Middle District of Florida and elsewhere, the defendant, willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service, U.S. Individual Income Tax Returns, Forms 1040, for each of the tax years set forth below, which were verified by a written declaration that they were made under the penalties of perjury and which VILLAFRANCA did not believe to be true and correct as to every material matter. Specifically, among other falsities, VILLAFRANCA did not report all her income, including rental income and the income she earned through the check cashing and cash courier service scheme, and falsely declared under penalty of perjury that the return and accompanying schedules and statements were true, correct, and complete, as set forth below:

| Approximate Date Filed | Tax Year | False Material Matters |
|---|---|---|
| 05/28/2020 | 2019 | Schedule E Omitted<br>Schedule 1, Line 5, Rental real estate, etc.<br>Line 7b, Total income |
| 5/21/2021 | 2020 | Schedule E Omitted<br>Schedule 1, Line 5, Rental real estate, etc.<br>Line 9, Total income |
| 4/26/2022 | 2021 | Schedule E Omitted<br>Schedule 1, Line 5, Rental real estate, etc.<br>Line 9, Total income |
| 4/18/2023 | 2022 | Schedule E Omitted<br>Schedule 1, Line 5, Rental real estate, etc.<br>Line 9, Total income |

Defendant's Initials _I V_      47

## Loss

80. As of the date of this filing, VILLAFRANCA and the conspirators caused a tax loss amount of approximately $38,303,965.99, which the parties agree represents the total actual tax loss in this case.

Defendant's Initials _LV_                48